IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Sharon Floyd, ) | |
| ) | Civil Action No. 6:07-2851-RBH-WMC |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Michael J. Astrue, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income benefits under Title XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed her application for supplemental security income (SSI) benefits on July 25, 2003 (protective filing date June 13, 2003), alleging that she became unable to work on December 1, 2002. The application was denied initially and on reconsideration by the Social Security Administration. On May 4, 2004, the plaintiff requested a hearing. The administrative law judge (ALJ), before whom the plaintiff and her

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

attorney appeared on November 5, 2004, considered the case *de novo*, and on May 27, 2005, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on August 22, 2005.  The plaintiff then filed sought judicial review.

By order of the Honorable R. Bryan Harwell, United States District Judge, filed August 31, 2006, the Commissioner's decision was reversed and the case was remanded for further administrative proceedings.  A supplemental hearing was held on February 22, 2007, at which the plaintiff, her attorney, and a vocational expert appeared.  On June 15, 2007, the ALJ again found that the plaintiff was not disabled.  The ALJ's finding became the final decision of the Commissioner.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)    The claimant has not engaged in substantial gainful activity since December 1, 2002, the alleged onset date (20 CFR 416.920(b) and 416.971 *et seq.*).
>
> (2)    The claimant has the following severe impairment: degenerative disc disease (20 CFR 416.920(c)).
>
> (3)    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> (4)    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to: sit for 6 hours of an 8-hour day; stand/walk for 2 hours of an 8-hour day; frequently lift/carry light items; occasionally lift 10 pounds; never climb ladders, scaffolds or ropes; never perform work that involves stooping and crouching; and never be exposed to hazards. She would also require a sit/stand option at will.
>
> (5)    The claimant is unable to perform any past relevant work (20 CFR § 416.965).

2

(6)    The claimant was born on July 16, 1964 and was 38 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).

(7)    The claimant has at least a high school education and is able to communicate in English (20 CFR § 416.964).

(8)    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

(9)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966(c).

(10)    The claimant has not been under a disability, as defined in the Social Security Act, since June 13, 2003, the date the application was filed (20 CFR § 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."   42 U.S.C. §423(a).   "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

3

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389

4

(1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a  verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff completed high school (Tr. 69) and worked in the relevant past as an assembly worker, health/beauty associate, mail handler, retail sales associate and resort steward (Tr. 64).  She stopped working in June 2002 because she "couldn't find a responsible babysitter that [she] c[ould] trust to take care of [her] kids" (Tr. 64).  She alleged that she became disabled on December 1, 2002, due to back problems, high blood pressure, and diabetes (Tr. 63).

The record reveals that during 2002 and early 2003, the plaintiff received medical care for low back pain, left-sided sciatica, lumbar strain and high blood pressure (Tr. 101-10, 176-78, 190-92, 241-46).  An MRI taken in June 2003 showed mild disc degeneration at the L5-S1 vertebrae with a disc protrusion that contacted and displaced the

5

left S1 nerve root (Tr. 114, 260). Dr. James K. Aymond, an orthopedist, recommended an epidural steroid injection (Tr. 175).

On August 12, 2003, Dr. Aymond noted that the plaintiff had not undergone the recommended steroid injection. On examination, a straight leg-raise test on the left reproduced left buttock and thigh pain, but neurological signs were otherwise normal. The plaintiff said she would notify Dr. Aymond if she wished to proceed with the steroid injection (Tr. 174).

On August 18, 2003, the plaintiff told chiropractor Brian P. Lima, D.C., that her low back pain radiated into her right leg. X-rays of her lumbar spine revealed segmental joint dysfunction of the right sacroiliac joint and the L5 vertebrae. On examination, she had decreased lumbar range of motion, tenderness and muscle spasms. Dr. Lima noted that the plaintiff had previously discontinued a recommended treatment plan (Tr. 111-12).

On August 20, 2003, the plaintiff presented to pain specialist Dr. Andrew Geer, who diagnosed lumbar radiculopathy and provided an epidural steroid injection. He provided an additional injection on September 2, 2003, noting that the plaintiff had "very modest relief if any" from the prior injection (Tr. 239).

The plaintiff presented to family practitioner Dr. Harold Nazon on September 30, 2003, for hypertension care. Dr. Nazon indicated that her blood pressure was aggravated in part by non-compliance with medication, but relieved by compliance. The plaintiff denied any physical symptoms related to her blood pressure. She also denied having any joint, muscle or back pain; numbness, weakness or tingling; or depression or anxiety. On examination, she had no edema in her extremities, no tenderness in her extremities or spine, a normal gait, normal balance, normal motor strength, intact sensation, equal and symmetrical reflexes, and blood pressure of 120/88 (Tr. 187-88).

At a follow-up visit with Dr. Nazon on October 13, 2003, the plaintiff "stated that she forgot to mention on her last visit that she had been having chronic [low back pain]

6

for [greater than] 1 year" and was contemplating surgery.  During a review of symptoms, she denied having any pain, numbness, weakness, depression, or anxiety.  Based on blood test results, Dr. Nazon diagnosed hypokalemia (low potassium), anemia, and hyperglycemia, plus low back pain and a drug reaction (Tr. 185-86).

On October 16, 2003, the plaintiff underwent surgery on her lumbar spine (Tr. 116-59).  The following day, she was able to ambulate safely and she refused a physical therapy evaluation (Tr. 120).  She was discharged and instructed to refrain from driving and lifting more than 15 pounds (Tr. 157).

The plaintiff returned to Dr. Aymond on November 7, 2003, and "continue[d] to do quite well with less lower back discomfort."  Although she had some left buttock pain, Dr. Aymond noted that "[t]his has improved a significant amount from that of pre-op." The plaintiff's motor and sensory signs were normal, and straight leg-raise testing did not reproduce any sciatic tension signs (Tr. 171).

On November 24, 2003, the plaintiff told Dr. Nazon she had been compliant with her medications and denied any side effects.  On examination, her extremities had no edema, and her back was mildly tender with pain on forward flexion.  Dr. Nazon noted that the plaintiff's blood pressure and low back pain remained "unchanged," that her hypokalemia was improving and her hyperglycemia was resolved (Tr. 184).

On December 7, 2003, a State agency physician reviewed the plaintiff's medical records and determined that by October 2004 (one year after her back surgery), the plaintiff would be able to lift 20 pounds occasionally and 10 pounds frequently; stand/walk about six hours and sit about six hours in an eight-hour workday; occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl; and never climb ladders, ropes, or scaffolds (Tr. 162-67).

On December 12, 2003, Dr. Aymond noted that the plaintiff was "making progress," but had some residual left buttock pain.  Her range of motion was "greatly improving" (Tr. 171).

At a follow-up visit on January 6, 2004, the plaintiff told Dr. Aymond that she still had left leg pain.  A straight leg-raise test was negative on the right and "mildly" positive on the left (Tr. 171).  A lumbar MRI taken two days later revealed minimal scar tissue at L5-S1, no evidence of recurrent disc herniation, and minimal persistent central disc bulging at L5-S1 (Tr. 259).

The plaintiff returned to Dr. Nazon on January 26, 2004, and indicated her hypertension was improving.  On examination, she had trace pre-tibial edema in her extremities.   Dr. Nazon noted that her hypertension was improving and that her hypokalemia had resolved (Tr. 181-82).

On February 24, 2004, the plaintiff sought emergency treatment for heart palpitations and feeling "nervous and scared."  She had a fever, and the attending physician felt that the fever and anxiety contributed to her rapid heart beat (Tr. 214-15).

On April 6, 2004, a State agency physician reviewed the plaintiff's medical records and determined that she could currently lift 20 pounds occasionally and 10 pounds frequently, and stand/walk and sit about six hours each in an eight-hour workday.  The physician did not assess any other limitations (Tr. 195-201).

On April 22, 2004, the plaintiff presented to family practitioner Dr. Betty Obong to establish primary care.  She reported ongoing back pain, poor sleep, and signs of depression.   Dr. Obong assessed "severe" depression and prescribed Paxil CR (an antidepressant) and Klonapin (an anti-seizure drug) (Tr. 206).

On May 18, 2004, the plaintiff returned to Dr. Obong and reported that she was feeling better on Klonapin, but not using Paxil because she was concerned about possible weight gain.  She complained of headaches and chronic low back pain (Tr. 204).

8

Two additional notes from Dr. Obong that appear to be dated June and/or July 2004, indicate that she diagnosed depression, anxiety/panic attacks and migraine headaches, and she adjusted the plaintiff's medications (Tr. 202-03). A note from Dr. Obong's clinic dated July 6, 2004, indicates that the plaintiff said Paxil helped her with stress, anxiety and depression, and that the frequency and severity of her migraines had decreased (Tr. 219).

The plaintiff returned to Dr. Geer on September 27, 2004, after a one-year absence. She walked with a cane and complained of severe back pain, but was not interested in injections. Dr. Geer wrote a note to Dr. Aymond stating that further surgical intervention was likely unnecessary, and that he had suggested that the plaintiff obtain some counseling as she seemed "somewhat" depressed and distressed due to a poor family support structure (Tr. 208).

On October 4, 2004, the plaintiff told Dr. Geer that she was "continuing to have some right-sided pain," and he administered an epidural steroid injection at L5-S1 (Tr. 207).

The results of a lumbar MRI taken on October 21, 2004, were "unchanged and unremarkable through the L4-L5 disc." There was "mild" loss of disc height and "mild" disc desiccation at L5-S1 on the left, no evidence of a recurrent disc herniation, and "mild increased enhancement involving the left S1 nerve root suggesting a radiculitis, although this nerve root is not compressed or effaced." Radiologist James A. Thesing, D.O., diagnosed "mild" degenerative disc disease at L5-S1 with evidence of previous surgery on the left. He noted that the plaintiff reported right-sided symptoms, but there was "no evidence of right-sided pathology" (Tr. 257).

On November 3, 2004, Dr. Obong completed a medical source statement in which she initially indicated that during an eight-hour workday, the plaintiff could sit zero hours, stand one hour, walk one hour, and work one hour due to her back problems. On

9

the next page, she reported that the plaintiff could sit 30 minutes and stand for no amount

of time.  She found the plaintiff could lift and carry up to 10 pounds occasionally and never

lift or carry more than that weight.  She found the plaintiff could occasionally climb, reach,

crouch and kneel, and never bend, squat, crawl or stoop.  Dr. Obong also indicated that the

plaintiff's impairments would cause her to be absent more than three times per month.  She

concluded that the plaintiff was "unable to work at this time" (Tr. 261-64).

On June 23, 2005, Dr. Obong wrote a letter stating that the plaintiff had loss

of function due to arthritis in her spine and decreased flexion and sensation.  She felt that

the plaintiff was unable to stand more than two hours and could not stoop or bend

repeatedly.  She also noted that the plaintiff had a generalized persistent anxiety disorder

that impaired her ability to work by interfering with her ability to focus and concentrate.  She

stated that the plaintiff had poor interpersonal skills and continuous conflict with family

members and medical care workers.  She concluded that the plaintiff's "mental health

disorder combined with her musculoskeletal impairment limits her ability to be gainfully

employed" (Tr. 265).

There is no evidence that the plaintiff sought or received any medical

treatment between June 2005 and October 2006, a period of 16 months.

Following remand at the end of August by this court, on October 28, 2006, the

plaintiff sought emergency treatment for her back pain.  The clinical impression was acute

right sciatica, and the plaintiff was discharged in improved condition (Tr. 353-57).

On November 3, 2006, Dr. Obong wrote a letter repeating her opinions from

the June 23, 2005, letter and adding that the plaintiff was unable to afford her medications

(Tr. 359).

A lumbar MRI taken on January 24, 2007, revealed preserved alignment, facet

hypertrophy with "mild" narrowing at L3-4, disc bulge and hypertrophy with "mild" narrowing

at L4/5, a shallow disc protrusion at L5/S1 with facet hypertrophy and "mild" narrowing on

10

the left, "left recess enhancement around transiting left S1," a "slight" central extrusion below S1, and a patent central canal. The radiologist's impression was that the extrusion at L5/S1 "may slightly contact" the left S1 nerve root and that there was a scar surrounding that nerve root. He noted that the overall volume of central disc protrusion was "essentially static" (Tr. 360).

On February 6, 2007, Dr. Obong completed another medical source statement in which she stated that the plaintiff could sit, stand, and walk one hour each during an eight-hour day, but work zero hours in any position. She found the plaintiff could occasionally lift and carry up to 10 pounds; sit for one hour at a time and stand for one hour at a time; not do repetitive pushing or pulling; occasionally squat, crawl, reach and kneel; and never bend, climb, stoop or crouch. She listed the objective signs as hyperreflexia, limited flexion, and MRI evidence of spinal stenosis and disc compression at multiple levels (Tr. 361-64).

On March 28, 2007, the plaintiff presented to Dr. Douglas E. McGill for a comprehensive orthopedic evaluation in connection with her application for benefits. The plaintiff said that her legs felt weak "at times" and that her pain was worse with sitting and activity. She said she had difficulty lifting and driving. The plaintiff also reported occasional flares of asthma. Dr. McGill noted that the plaintiff lived with her two children and was able to manage her activities of daily living. On examination, the plaintiff was alert, oriented and in no apparent distress. She had normal range of motion in the major joints, neck and trunk, and was able to get on and off the examination table, although she exhibited guarding behaviors. She walked with a slow and determined gait, but Dr. McGill noted that she had been observed walking at a "faster pace with normal gait across the parking lot" and was able to get in and out of her car without apparent difficulty. Her reflexes were normal and symmetric in all extremities. The plaintiff reported decreased sensation on the left side of her body. Her fine and gross motor movements appeared intact. An

11

accompanying range of motion chart showed that the plaintiff had motion within normal limits in her all areas, including her lumbar spine.  A supine straight leg-raise test was limited to 60 degrees due to pain, but a sitting straight leg-raise test was unlimited, as the plaintiff reached the full 90 degrees.  The plaintiff walked slowly in tandem walk and heel/toe walk tests, and Dr. McGill noted that she "uses [a] straight cane at times."  Dr. McGill's impression was that the scar tissue adjacent to the S1 nerve root could cause nerve root irritation, "however, there are minimal focal findings on exam and many of her symptoms [we]re not consistent with the radiographic pathology."  He noted that the plaintiff appeared to have significant components of chronic pain syndrome with psychological dependence and focus on her pain.  He concluded that "[r]outine post operative precautions and restrictions for degenerative disc disease would appear appropriate" (Tr. 366-69).

In an accompanying medical source statement form, Dr. McGill reported that the plaintiff could lift and carry up to 20 pounds frequently and 50 pounds occasionally, sit for one hour at a time (four hours total), and stand/walk for two hours at a time (four hours total) in an eight-hour work day.  He indicated that the plaintiff did not require the use of a cane to ambulate.  He stated that she could do no crawling or climbing on ladders or scaffolds; occasional overhead reaching, climbing on ramps and stairs, stooping, kneeling and crouching; and frequent reaching in other directions, pushing, pulling, stooping and operation of foot controls.  Dr. McGill further found the plaintiff could never be exposed to unprotected heights or dust/odors/fumes; could occasionally be exposed to moving mechanical parts, humidity/wetness, extreme temperatures and moderate noise; and could frequently operate a motor vehicle and be around vibrations.  He noted that she could perform a number of activities (shopping, traveling alone, walking on rough or uneven surfaces, use transportation, climb steps at a reasonable pace, prepare simple meals, care for personal hygiene and handle paper files (Tr. 371-75).

At her hearing following remand, the plaintiff testified that she was unable to work from low back pain going down both legs (Tr. 383). She reported some improvement after surgery, with a residual nagging pain (Tr. 385). She rated her pain as a 9-10 on a scale of one to 10, and rated her leg pain as a 10 (Tr. 385). She complained of medication side effects such as lightheadedness and drowsiness (Tr. 387). She also testified that she cried a lot and that her antidepressant medication was "not really" helping (Tr. 390). As to her abilities, the plaintiff testified that she could stand for 30 minutes to an hour and sit 15 to 20 minutes at a time (Tr. 386-87). She testified that she could do light housework like folding clothes and light sweeping, but not vacuuming (Tr. 388). She stated that during a typical day, she did some exercises, took her medications, and once a week went to her children's schools to check on them (Tr. 389-90).

Vocational expert Arthur Schmidt, Ph.D., testified that the plaintiff's past work was unskilled and ranged from light to medium in exertion (Tr. 391).[2] The ALJ asked him to consider a hypothetical individual of the plaintiff's age, education and work experience who was limited to unskilled sedentary work[3] with an option to sit or stand at will; could not climb ladders, scaffolds, or ropes, but could occasionally climb ramps or stairs; could occasionally balance, stoop, bend, kneel, crouch and crawl; and could not be around hazards such as unprotected heights and dangerous machinery (Tr. 391). The vocational expert testified that the individual could perform the unskilled sedentary jobs of surveillance systems monitor (DOT[4] 379.367-010, 1,892 jobs in the state and 48,600 jobs nationally);

---

[2]"Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 416.968(a). "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." *Id.* at § 416.967(b). "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." *Id.* at § 416.967(c).

[3]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 416.967(a).

[4]U.S. Dep't of Labor, *Dictionary of Occupational Titles* (4th ed. Rev. 1991) ("DOT").

coupon recycler (DOT 290.587-010, 98 jobs in the state and 13,000 jobs nationally); and addresser (DOT 209.587-010, 1,960 jobs in the state, 318,000 jobs nationally) (Tr. 392). He stated that his testimony was based on the DOT and that any inconsistencies were based on knowledge gained through his professional experience (Tr. 392).

## **ANALYSIS**

The plaintiff completed high school (Tr. 69) and worked in the relevant past as an assembly worker, health/beauty associate, mail handler, retail sales associate, and resort steward (Tr. 64). She stopped working in June 2002 because she "couldn't find a responsible babysitter that [she] c[ould] trust to take care of [her] kids" (Tr. 64). She alleged that she became disabled on December 1, 2002, due to back problems, high blood pressure, and diabetes (Tr. 63). She was 38 years old on her alleged date of onset of disability.

Following remand by Judge Harwell for further administrative proceedings, a supplemental hearing was held on February 22, 2007, at which the plaintiff, her attorney, and a vocational expert appeared. Upon remand, the ALJ was directed to explain why the plaintiff's impairments do not meet Listing 1.04A, to re-evaluate the opinion of Dr. Obong, to re-evaluate the plaintiff's subjective complaints, and to obtain vocational expert testimony in a supplemental hearing. As set forth above, the ALJ found that the plaintiff could perform sedentary work with the restrictions to never climb ladders, scaffolds or ropes; never perform work that involves stooping and crouching; and never be exposed to hazards. The ALJ further found that the plaintiff would also require a sit/stand option at will. The plaintiff alleges that the ALJ erred by (1) finding that her depression and anxiety were not severe impairments; (2) failing to conduct a proper listing analysis of Listing 1.04, Disorders of the Spine: (3) failing to properly evaluate the opinion of her treating physician; (4) failing to properly consider the fact that she could not afford medical treatment in assessing her

14

depression and credibility; and (5) improperly assigning her a residual functional capacity that is unsupported by the evidence.

### *Severe Impairments*

An impairment is severe when it is more than a slight abnormality that has more than a minimal effect on the ability to do basic work activities. *See* Social Security Ruling (SSR) 96-3p; 20 C.F.R. §§ 404.1520(a), 404.1521; *see also, e.g., Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) (citations and internal punctuation omitted). The ALJ found that the plaintiff's only severe impairment was degenerative disc disease. The ALJ found as follows with regard to the plaintiff's depression and anxiety:

> The medical evidence reveals that the claimant's depression/ anxiety is non-severe in nature. The claimant has never sought psychiatric treatment or counseling, and has never been hospitalized or treated by a mental health facility. Additionally, although the claimant has been assessed with depression/ anxiety, this condition has not resulted in more than: mild restriction in her activities of daily living; mild limitations in her social functioning; mild deficiencies of her concentration, persistence, or pace, or any episodes of deterioration or decompensation in work or work-like settings. As a result, the claimant's depression has no more than a minimal effect on the claimant's ability to perform basic work activities and is a non-severe impairment (20 C.F.R. § 404.1521).

(Tr. 274-75).

The ALJ did not err in finding that the plaintiff's depression and anxiety were not severe impairments. As argued by the defendant, the plaintiff's treatment for depression and anxiety was sparse and conservative in nature, and the record indicates that medications effectively alleviated her symptoms. These were appropriate factors for consideration. In September and October 2003, the plaintiff specifically denied having any depression or anxiety (Tr. 185, 187), and she did not raise any complaints until April 2004, at which time Dr. Obong, a family practitioner, treated her conservatively with Paxil and

15

Klonapin (Tr. 206).  One month later, the plaintiff told Dr. Obong that she felt better on Klonapin, but was not taking Paxil due to a fear of possible weight gain (Tr. 204).  She apparently started Paxil anyway, because in July 2004 she said that it helped her anxiety and depression and decreased the frequency of headaches (Tr. 219).  The only other treatment note referencing ongoing psychological problems was in September 2004, when Dr. Geer noted that the plaintiff seemed "somewhat" depressed and distressed due to a lack of family support (Tr. 208).  The plaintiff did not seek treatment for her depression and anxiety from any other physician or mental health care provider thereafter, and there is no evidence that her psychological impairments significantly affected her ability to perform basic work activities for a continuous 12 months.

          As to the medical source opinions about the plaintiff's mental abilities, when Dr. Obong first assessed her functional limitations in November 2004, she did not cite any mental limitations (Tr. 261-64).  In July 2005 and November 2006, Dr. Obong completed two assessments in which she indicated that the plaintiff would have difficulty focusing, concentrating, and interacting with others, and that her combination of impairments would limit her ability to be gainfully employed (Tr. 265, 359).  As the ALJ observed, these latter opinions, however, were rendered 12 and 28 months, respectively, after Dr. Obong last examined the plaintiff in July 2004, and were inconsistent with her own treatment notes documenting improvement in the plaintiff's symptoms (Tr. 280).  Moreover, in Dr. Obong's final evaluation of the plaintiff's functional limitations in February 2007, she did not assess any mental limitations (Tr. 362-64), so her own opinions were inconsistent with each other (*see* Tr. 279-81 (ALJ's evaluation of Dr. Obong's assessments)).  No other medical source concluded that the plaintiff had any mental functional limitations, and the most recent findings from Dr. McGill indicated that the plaintiff was alert, oriented and in no distress; able to manage her activities of daily living and care for two children; shop; and travel alone (Tr. 367-68, 375).  Further, as pointed out by the defendant, the ALJ gave the plaintiff the

16

benefit of the doubt and restricted her to unskilled jobs (Tr. 282).  Based upon the foregoing, the ALJ did not err.

### Listing 1.04

The plaintiff argues that the ALJ failed to properly consider her impairments under Listing 1.04.  Listing 1.04 provides in pertinent part:

> 1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture) *resulting in a compromise of a nerve root (including the cauda equina) or the spinal cord.*
> With:
> A. *Evidence of nerve root compression characterized by* neuro-anatomic distribution of *pain, limitation of motion* of the spine, *motor loss* (atrophy with associated muscle weakness or muscle weakness) accompanied by *sensory or reflex loss* and, if there is involvement of the lower back, *positive straight-leg raising test (sitting and supine);*
> *or*
> B. Spinal arachnoiditis . . . .
> *or*
> C. Lumbar spinal *stenosis resulting in pseudoclaudication*, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, *and resulting in inability to ambulate effectively, as defined in 1.00B2b.*

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04 (emphasis added).

The ALJ found as follows:

> I have specifically considered whether the claimant's degenerative disc disease meets Listing 1.04. To meet Listing 1.04, a disorder of the spine must result in compromise of a nerve root or spinal cord with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting pseudoclaudication. While Dr. Obong reported that the claimant had spinal stenosis, there is no documentation of pseudoclaudication. There is no evidence of spinal arachnoiditis. While MRI's have revealed a shallow extrusion of L5-S1 which may slightly contact the SI nerve root, there is no evidence that this condition result[s] in nerve root impingement characterized by neuro-anatomic distribution of pain, limitation

17

of motion of the spine, motor loss accompanied by sensory/reflex loss, or positive straight-leg raising test (sitting and supine).   Therefore, the claimant's degenerative disc disease does not meet Listing 1.04.

(Tr. 275).

As argued by the defendant, the ALJ first accurately pointed out that there was no evidence of spinal arachnoiditis or documented pseudoclaudication, which eliminates subsections B and C above (Tr. 275).  To the extent the plaintiff claims that pseudoclaudication symptoms were present even though the term itself was not mentioned, even if that is true, the requirements of subsection C would still not be met, because there is no evidence that the plaintiff had an inability to ambulate effectively, as defined by section 1.00(B)(2)(b) in the introduction to the musculoskeletal listings.[5]  Here, the plaintiff had a normal gait in September 2003 (Tr. 188), ambulated safely in October 2003 (Tr. 120), walked with a slow and determined gait (but walked with a faster pace and normal gait across a parking lot) in March 2007 (Tr. 279, 368), and used one straight cane "at times" (Tr. 368).  Accordingly, the requirements of subsections B and C of Listing 1.04 are not met, and the only way the plaintiff's impairment could meet this Listing would be to satisfy all the requirements of subsection A.

To establish that a Listing is met, the medical criteria must be met for a period of 12 continuous months.  *See* Social Security Ruling (SSR) 86-8 ("Thus, when such an individual's impairment or combination of impairments meets or equals the level of severity described in the Listing, and also meets the duration requirement, disability will be found . . . .").  There is no evidence that the plaintiff's back impairment satisfied all the criteria of

---

[5]"Inability to ambulate effectively" is defined as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." Examples of ineffective ambulation include "the inability to walk without use of a walker, two crutches or two canes . . . ."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b).

18

Listing 1.04(A), but even giving the plaintiff further benefit of the doubt, there is no evidence that the criteria were satisfied for 12 continuous months.

First, Listing 1.04(A) requires evidence of nerve root compression. Prior to the plaintiff's surgery, an MRI showed displacement of the left S1 nerve root. However, the October 2004 MRI (the first taken after the plaintiff's surgery) showed "mild increased enhancement involving the left S1 nerve root suggesting a radiculitis although *this nerve root is not compressed* or effaced" (Tr. 257) (emphasis added). In addition, the second MRI, taken in January 2007, indicated that a disc extrusion at L5/S1 "may slightly contact" the left S1 nerve root and that there was a scar surrounding that nerve root (Tr. 360). While the nerve root may have been in contact with other matter, causing nerve root irritation (Tr. 367), there was no evidence of nerve root *compression*. Even assuming nerve root compression was present, not all of the remaining criteria of Listing 1.04(A) are satisfied. The Commissioner acknowledges in his brief that there appeared to be a neuroanatomic distribution of pain. However, the plaintiff's range of motion was "greatly improving" in December 2003 (Tr. 171), and Dr. McGill's March 2007 evaluation revealed range of motion within normal limits in all areas, including her lumbar spine (Tr. 368). While Dr. Obong cited decreased spinal flexion in her June 2005 letter and February 2007 medical source statement (Tr. 265, 364), her treatment notes do not contain any independent objective findings pertaining to the plaintiff's spine. There also is no consistent evidence of motor loss accompanied by sensory or reflex loss. The plaintiff had normal motor strength, intact sensation, and equal reflexes in September 2003 (Tr. 188). She denied having any weakness in September and October 2003 (Tr. 185, 187). She had normal motor and sensory signs in November 2003 (Tr. 171). She reported weakness "at times" and decreased sensation on the entire left side of her body in March 2007 (Tr. 366-68), but maintained normal reflexes and intact motor movements on examination (Tr. 367-68). Finally, the Listing's requirement of positive straight-leg raising (sitting *and* supine)"

19

(emphasis added) is not satisfied.  Prior to her surgery, testing was positive on the left in August 2003 (Tr. 174), and five months after surgery one test was "mildly" positive on the left in January 2004 (Tr. 171).  However, the next test in the record indicated that only the supine test was positive and the sitting test was negative (Tr. 368).  Thus, because the plaintiff did not show that her spinal impairment met *all* of the specified medical criteria in Listing 1.04(A), (B), or (C), substantial evidence supports the ALJ's finding that her impairment did not meet this Listing so as to be presumed disabling.  *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

Likewise, the plaintiff has not demonstrated that her combination of impairments is "equivalent" to a Listing by presenting medical findings equal in severity to *all* the criteria for the one most similar Listing.  *See id.* at 531.  The plaintiff appears to argue that because she had a combination of impairments (the severe spinal impairment and other impairments), the combination was equivalent to all the criteria in Listing 1.04(A).  In *Gordon v. Schweiker*, 725 F.2d 231, 234-35 (4th Cir. 1984), the Fourth Circuit Court of Appeals held that the claimant's argument that an accumulation of unrelated impairments equaled a Listing lacked merit.  *See also* SSR 86-8, 1986 WL 68636, *4 ("The mere accumulation of a number of impairments will not establish medical equivalency.").  The same is true here.  Moreover,

> [i]n no case are symptoms alone a sufficient basis for establishing the presence of a physical or mental impairment.
>
> Any decision as to whether an individual's impairment or impairments are medically the equivalent of a listed impairment must be based on medical evidence demonstrated by medically acceptable clinical and laboratory diagnostic techniques, including consideration of a medical judgment about medical equivalence furnished by one or more physicians designated by the [Commissioner]. The Disability Determination Services physician's documented medical judgment as to equivalency meets this regulatory requirement.

*Id.*

Because the ALJ addressed all of the plaintiff's impairments throughout the decision and their resulting limitations on her ability to do basic work activities, there is nothing to suggest that they were not properly considered in combination, and he referenced her "combination of impairments" in Finding 3 (Tr. 275).  *See, e.g., Eggleston v. Bowen*, 851 F.2d 1244, 1247 (10th Cir. 1988).  Furthermore, Regina A. Roman, D.O., and William H. Cain, M.D., State agency medical consultants, signed "Disability Determination and Transmittal" forms, indicating that they considered the combined effects of all of the plaintiff's impairments and did not find them to be equivalent in severity to any Listings (Tr. 39-40).  *See* SSR 96-6p, 1996 WL 374180, *3 ("[L]ongstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the [ALJ] or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight. . . . .  When an [ALJ] or the Appeals Council finds that an individual s impairment(s) is not equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record may be satisfied by any of the foregoing documents signed by a State agency medical or psychological consultant.").  Accordingly, the plaintiff's arguments concerning the Listings must fail.

### *Treating Physician*

The plaintiff alleges that the ALJ failed to properly consider the opinion of her treating physician, Dr. Obong.  The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case.  *See* 20 C.F.R. § 416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions.  These are administrative findings reserved

21

for the Commissioner's determination.  SSR 96-2p.  Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors:  (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion.  20 C.F.R. § 404.1527(d)(2)-(5).  Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion.  SSR 96-2p, 1996 WL 374188, *5.  As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* 1996 WL 374188, *4.

Dr. Obong's opinions were as follows:

(1)    In November 2004, Dr. Obong found the plaintiff could sit zero hours, stand one hour, walk one hour, and work one hour total per eight-hour workday; could never lift more than 10 pounds; could occasionally perform postural activities; would miss more than three days of work per month; and was "unable to work at this time" (Tr. 261-64).

22

(2)    In June 2005, Dr. Obong stated that the plaintiff could not stand for more than two hours or repeatedly stoop or bend; that her anxiety interfered with her ability to focus, concentrate, and interact with others; and that her combination of impairments limited her ability to be gainfully employed (Tr. 265).

(3)    In November 2006, Dr. Obong repeated her opinions from June 2005 (Tr. 359).

(4)    In February 2007, Dr. Obong found the plaintiff could sit, stand, and walk one hour at a time each and one hour total each during an eight-hour day, but work zero hours in any position; could occasionally lift and carry up to 10 pounds; could not do repetitive pushing or pulling; could never bend, climb, stoop, or crouch; and could occasionally squat, crawl, reach, and kneel (Tr. 361-63).

The ALJ accorded the opinions of Dr. Obong "minimal weight" (Tr. 279).  The ALJ noted that Dr. Obong's November 2004 and February 2007 assessments were check-off forms that were provided by the plaintiff's attorney (Tr. 280).  As pointed out by the plaintiff, however, the opinion of Dr. McGill, upon which the ALJ relied also included a check-off form, and it was requested by the ALJ (*see* Tr. 365, 368-75).  However, the ALJ went on to thoroughly discuss and give other legitimate reasons for discounting Dr. Obong's opinions (Tr. 280-81).  First, he noted the limited nature of Dr. Obong's treatment relationship with the plaintiff and the lack of evidence that Dr. Obong evaluated the plaintiff after mid-2004, which weakened the opinions that were issued several months to several years after the last appointment (Tr. 280).  *See Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001) (fact that treating physician's statement of disability was communicated a year after he last saw claimant for treatment allowed ALJ to assign that physician's opinion lesser weight).  Second, he noted the fact that the objective findings cited in Dr. Obong's opinions, i.e., increased paraspinal tenderness, hyperreflexion, and limited flexion, did not appear in her own treatment notes (Tr. 280).  Third, he noted the lack of support for Dr. Obong's opinions in other evidence of record, including the MRIs showing no recurrent disc

23

herniation and mild degeneration.   He took notice of Dr. McGill's note that there were minimal focal findings on examination and that the plaintiff's symptoms were not consistent with radiographic evidence (Tr. 280). Fourth, the ALJ observed that Dr. Obong was a family practitioner rather than an orthopedist, and that the plaintiff's treating orthopedist,  Dr. Aymond, did not restrict plaintiff's activities (Tr. 281).  The ALJ also noted that Dr. Obong was not a psychiatrist or psychologist, and there is no evidence of treatment or restriction by any mental health care specialists in the record.  Fifth, the ALJ noted that Dr. Obong's opinions were more about vocational matters rather than medical, and that she apparently relied heavily on the plaintiff's subjective complaints, which were not fully credible (Tr. 281). Based upon the foregoing, the ALJ did not err in giving Dr. Obong's opinions minimal weight.

### *Credibility*

The plaintiff next argues that the ALJ failed to properly assess her credibility. A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence.  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility."  *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record."  Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." SSR 96-7p, 1996 WL 374186, *4.

In addition to the objective medical evidence, the factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3.

The ALJ found as follows with regard to the plaintiff's credibility: "After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" (Tr. 277). The ALJ went on to set forth the reasons for this finding. The ALJ stated that the plaintiff's limited activities of folding clothes and having lunch weekly with her children demonstrated an ability to work more than a few hours per day or on more than an intermittent basis (Tr. 277). The ALJ also considered the plaintiff's improvement after back surgery, the lack of ongoing treatment, and the conservative nature of her treatment (Tr. 277). He also properly considered the lack of

25

objective findings in support of her allegations (Tr. 277-78).  Next, he correctly noted that the plaintiff's testimony about medication side-effects was not corroborated in the medical records (Tr. 278).  Additionally, he noted that medications were effective at alleviating her psychological symptoms and headaches (Tr. 278).  Moreover, the ALJ noted Dr. McGill's findings that the plaintiff's claim of right-sided symptoms was inconsistent with radiographic evidence of only left-sided pathology; that she demonstrated guarding behavior on examination; and that she demonstrated difficulty getting on and off the examination table and a slow gait on examination, yet was observed ambulating at a faster pace with a normal gait across the parking lot and got in and out of her car without difficulty (Tr. 279).

The ALJ further noted that there was some evidence of noncompliance with treatment in the record (Tr. 278).  The ALJ cited the report of Dr. Lima, a chiropractor, who noted on August 18, 2003, that he had seen the plaintiff on three occasions in December 2002, but the plaintiff discontinued the recommended treatment plan (Tr. 111-12).  The ALJ also noted that in June 2003, Dr. Aymond recommended that the plaintiff have an epidural injection, but in August 2003 Dr. Aymond stated that the plaintiff did not have the injection as recommended (Tr. 174-75).  Dr. Nazon's treatment notes report that the plaintiff had failed to be compliant in taking her blood pressure medications (Tr. 187-88).  Further, in May 2004, Dr. Obong noted that the plaintiff was not taking her Paxil as prescribed secondary to fear of weight gain (Tr. 204).

The plaintiff argues that the ALJ failed to properly consider the fact that she cannot afford treatment (pl. brief 15-17).  However, as argued by the Commissioner, the plaintiff's alleged inability to afford treatment is unsupported by any evidence that the plaintiff was denied medical care for financial reasons or that she ever sought low- or no-cost medical care.  *See, e.g., Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (without evidence that claimant was ever denied medical treatment due to financial reasons, failure to take medication is relevant to credibility determination); *Seimers v. Shalala*, 47 F.3d 299,

26

301-302 (8th Cir. 1995) (fact that claimant did not seek regular medical treatment for her back pain or depression, allegedly due to cost, although she was able to afford medical treatment for other ailments, were inconsistencies the ALJ could rely upon to find her testimony not credible).

Based upon the foregoing, substantial evidence supported the ALJ's finding that the plaintiff's subjective complaints of disabling limitations were not fully credible.

### *Residual Functional Capacity*

The ALJ found that the plaintiff had the residual functional capacity to perform unskilled sedentary work with a sit/stand option at will and restrictions on postural activities and exposure to hazards (Tr. 275, 391). The ALJ properly determined that the plaintiff's allegations of disabling spinal and other impairments were not supported by the treatment notes and medical findings of record (Tr. 277-78). After her back surgery in October 2003, the plaintiff was able to ambulate safely and was discharged in "excellent" condition, with the only restriction being to refrain from driving and lifting more than 15 pounds (Tr. 157). The next month, Dr. Aymond, her treating orthopedist, noted that she was doing "quite well with less lower back discomfort" and that her left buttock pain had "improved a significant amount" (Tr. 171). The plaintiff had normal motor and sensory signs, no edema in her extremities, mild back tenderness, and no medication side-effects at that time (Tr. 171, 184). Records from late 2003 and into 2004 continued to document improvement in her impairments. *See, e.g.,* Tr. 171 (December 2003 – "making progress" and range of motion "greatly improving"), 171 (January 2004 – straight leg raise test negative on the right and only mildly positive on the left); 259 (January 2004 – MRI showed minimal scar tissue, no evidence of recurrent disc herniation and minimal persistent disc bulging); 181 (January 2004 – hypertension improving, only "trace" edema in legs); 204, 219 (May and July 2004 – psychological symptoms and headaches improving on medication).

27

The ALJ also properly considered the nature and extent of the plaintiff's treatment and, as discussed above, the plaintiff's allegations of inability to afford treatment are not documented by any denials of medical service for financial reasons or any attempts to seek free or low-cost medical care. There are significant gaps in the plaintiff's treatment history. Between October 2004 (when she underwent a lumbar MRI) and October 2006 (when she sought emergency treatment of her back pain), there is no evidence that the plaintiff sought or received any medical care for her allegedly disabling impairments. The only relevant records during that two-year time period are the unsupported opinions of Dr. Obong (who had not seen the plaintiff since July 2004). Following the emergency room visit in October 2006, the plaintiff underwent an MRI in January 2007, but otherwise did not see a physician again until her March 2007 appointment with the consultative examiner (Dr. McGill) in connection with her application for benefits.

In addition to considering the objective medical findings and the nature of the plaintiff's treatment, the ALJ also properly considered the medical source opinions about the plaintiff's functional abilities (Tr. 278-81). Her initial postoperative restrictions upon discharge from the hospital were to refrain from driving and lifting more than 15 pounds (Tr. 157). Subsequently, State agency physicians found that within six months of surgery, the plaintiff could lift 20 pounds occasionally and 10 pounds frequently, and stand/walk and sit about six hours each in an eight-hour workday, with no other limitations (Tr. 195-201). Most recently, the consulting orthopedist, Dr. McGill, evaluated the plaintiff and determined that she could lift and carry up to 20 pounds frequently and 50 pounds occasionally; sit one hour at a time (for four hours total) and stand/walk for two hours at a time (for four hours total) in an eight-hour workday; never crawl or climb ladders or scaffolds; occasionally reach overhead, climb ramps or stairs, stoop, kneel and crouch; frequently reach in other directions, push, pull, stoop and operate foot controls; never be exposed to unprotected heights or dust/odors/fumes; occasionally be exposed to moving mechanical parts,

28

humidity, wetness, extreme temperatures and moderate noise levels; and frequently operate a motor vehicle and work around vibration (Tr. 370-75).  None of these restrictions would preclude a limited range of sedentary work with a sit/stand option at will and restrictions on postural activities and exposure to hazards or the specific jobs cited by the vocational expert.  Further, as discussed above, the ALJ did not err in giving Dr. Obong's opinions minimal weight.  *See Hunter v. Sullivan*, 993 F.2d 31, 35-36 (4th Cir. 1992) (finding the ALJ did not err in giving more weight to the opinion of an examining physician than to that of a treating physician).  Based upon the foregoing, substantial evidence supports the ALJ's determination of the plaintiff's residual functional capacity.

## **CONCLUSION AND RECOMMENDATION**

This court has considered the entire record and finds that the ALJ's decision that the plaintiff is not disabled is based upon substantial evidence.  Based upon the foregoing, this court recommends the decision of the Commissioner be affirmed.

s/William M. Catoe
United States Magistrate Judge

September 4, 2008

Greenville, South Carolina

29